**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SEQURETEK, INC.; ANAND MAHENDRABHAI NAIK; NIDHI ANAND NAIK; A.N. and A.N., minor children,<br><br>Plaintiffs,<br><br>v.<br><br>USCIS ACTING DIR. KENNETH T. CUCCINELLI, CHAD F. WOLF, GREGORY A. RICHARDSON, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, and UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br>Defendants. | Civ. No. 20-05462 (KM) (JBC)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

The United States Citizenship and Immigration Services (collectively with the other agency and officials named as defendants, the "Service") denied the visa petition of Sequretek Inc. on behalf of its chief executive officer, Anand Mahendrabhai Naik. Sequretek and Mr. Naik, plus his wife and children, whose immigration status is also affected, allege that the Service's denial violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The parties cross-move for summary judgment. (DE 37, 38.)[1] For the following reasons, the Service's motion (DE 37) is **DENIED**, and Plaintiffs' motion (DE 38) is **GRANTED**.

---

[1] Certain citations to the record are abbreviated as follows:

DE = docket entry

Am. Compl. = Amended Complaint (DE 2)

A.R. = Certified Administrative Record (DE 31), pin citations refer to the Bates numbers at the bottom of each page

I. **BACKGROUND**

   A. **Statutory and Regulatory Background**

The Immigration and Nationality Act ("INA") created the "L visa" program, which "allow[s] multinational firms to transfer employees from the firm's overseas operations to its operations in the United States." *Brazil Quality Stones, Inc. v. Chertoff*, 531 F.3d 1063, 1066 (9th Cir. 2008). An L visa is available to "an alien who, after being employed continuously by the sponsoring employer for at least one year in the three years preceding his or her application, seeks to enter the United States to continue working for that employer (or an affiliate) 'in a capacity that is managerial, executive, or involves specialized knowledge.'" *Fogo De Chao (Holdings) Inc. v. U.S. Dep't of Homeland Sec.*, 769 F.3d 1127, 1130 (D.C. Cir. 2014) (quoting 8 U.S.C. § 1101(a)(15)(L)). "[A] visa for managerial or executive employees is known as an L-1A visa," *id.*, and is the visa at issue here.

If the employee is coming to the United States to open or be employed in a new office for the firm, the visa is only valid for up to a year, but the firm may apply for an extension. 8 C.F.R. § 214.2(*l*)(7)(i)(A)(3). To extend the visa, the firm must provide the following:

> (A) Evidence that the United States and foreign entities are still qualifying organizations . . . . ;
>
> (B) Evidence that the United States entity has been doing business . . . for the previous year;
>
> (C) A statement of the duties performed by the beneficiary for the previous year and the duties the beneficiary will perform under the extended petition;
>
> (D) A statement describing the staffing of the new operation, including the number of employees and types of positions held accompanied by evidence of wages paid to employees when the beneficiary will be employed in a managerial or executive capacity; and
>
> (E) Evidence of the financial status of the United States operation.

*Id.* § 214.2(*l*)(14)(ii).

As relevant here, some terms in that list have specific definitions. "Doing business," as used in subsection (B), "means the regular, systematic, and continuous provision of goods and/or services and does not include the mere presence of an agent or office of the qualifying organization in the United States and abroad." *Id.* § 214.2(*l*)(1)(ii)(H). "Executive capacity," as used in subsection (D), means that the employee "primarily"

> (1) Directs the management of the organization or a major component or function of the organization;
>
> (2) Establishes the goals and policies of the organization, component, or function;
>
> (3) Exercises wide latitude in discretionary decision-making; and
>
> (4) Receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

*Id.* § 214.2(*l*)(1)(ii)(C). "Managerial capacity," as used in subsection (D), means that the employee "primarily"

> (1) Manages the organization, or a department, subdivision, function, or component of the organization;
>
> (2) Supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;
>
> (3) Has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) if another employee or other employees are directly supervised; if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and
>
> (4) Exercises discretion over the day-to-day operations of the activity or function for which the employee has authority. A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

*Id.* § 214.2(*l*)(1)(ii)(B).

The Service reviews the evidence submitted and determines visa eligibility. *Id.* § 214.2(*l*)(1)(i). If the Service approves a visa for an employee, his

or her spouse and minor children may also receive a visa (an "L-2 visa"). *Id.* § 214.2(*l*)(7)(ii).

### B. Sequretek's Submissions

Sequretek IT Solutions Pvt. Ltd. is an India-based IT company. (A.R. at 446–48.) Mr. Naik has worked as Sequretek IT Solutions' CEO since 2013. (*Id.* at 448.) Sequretek IT Solutions formed Sequretek Inc. (plaintiff here), a wholly owned subsidiary to operate in the United States, and appointed Mr. Naik as CEO of Sequretek Inc. (*Id.* at 42, 447.)

Sequretek Inc. filed a new office L-1A petition on behalf of Mr. Naik, which the Service approved for the period of March 12, 2019 to March 11, 2020. (*Id.* at 2, 427.) Mr. Naik and his family entered the United States in September 2019. (*Id.* at 428.) He worked to develop the New Jersey office. (*See id.* at 404, 450, 460–75.)

In February 2020, Sequretek applied to extend Mr. Naik's visa through March 2022. (*Id.* at 433, 446.) The Service responded that Sequretek's supporting documentation was lacking and requested more evidence. (*Id.* at 2–3.) Specifically, the Service explained that Sequretek had not shown that (1) it had been doing business in the United States in the past year, because the bank statements provided showed minimal activity, and (2) Mr. Naik would be employed in a primarily executive or managerial role, because the petition had not provided evidence about the scope of his subordinates' work. (*Id.* at 2–5.)

Sequretek responded with more documentation. (*Id.*) Nevertheless, the Service found that Sequretek had still not shown that it had been doing business in the United States or that Mr. Naik would be employed in an executive or managerial capacity.

As to the "doing business" conclusion, the Service explained its view of the evidence as follows:

- Sequretek's bank statements showed "mostly withdrawals/debits and very few deposit/credits," and its 2019 tax return likewise showed gross receipt of sales were only $15,668.

4

- Although Sequretek provided W-2s for employees totaling over $300,000, the employer identification number did not match Sequretek's.
- Tax forms for Mr. Naik specifically showed that he was paid around $35,000 since his entry into the United States, which did not support Sequretek's assertion that he would be paid $250,000 a year.
- The majority of invoices submitted as evidence of sales did not show that they were paid.
- An audit report of Sequretek IT Solutions did not show the financial status of Sequretek Inc.

(*Id.* at 3.)

As to the "executive or managerial capacity" conclusion, the Service explained its view of the evidence as follows:

- Squretek only provided "broad" and "vague" descriptions of Mr. Naik's duties.
- Squretek only provided evidence of five employees, and with such a limited number, it could not be determined that Mr. Naik would be employed primarily as an executive.
- The description of subordinates' duties was "general," and there was no corroborating evidence.
- The Service acknowledged that Sequretek had submitted an expert report from a business professor, but explained that it need not consider expert opinions.

(*Id.* at 6.)

Based on these deficiencies, the Service denied the petition. (*Id.* at 7.)

## C. Procedural History

Sequretek and the Naiks sued the Service.[2] (DE 1.) The Amended Complaint asserts three claims: (1) the denial of Sequretek's petition violated

---

[2] Sequretek and the Naiks named as defendants: (1) Gregory A. Richardson, Director of the Texas Service Center, (2) Kenneth T. Cuccinelli, then-acting Director of

the APA; (2) pending denials of Mrs. Naik's and the children's derivative petitions will likewise violate the APA; and (3) Plaintiffs are entitled to injunctive relief. (Am. Compl. ¶¶ 46–72.) The Amended Complaint asks the Court to set aside the denials and order the Service to approve the petitions. (*Id.*, Prayer.) Because the record is complete, the parties cross-move for summary judgment.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Neto v. Thompson*, --- F. Supp. 3d ----, ----, Civ. No. 20-618, 2020 WL 7310636, at *2 (D.N.J. Dec. 10, 2020) (quoting *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001)). In such a case, "the district court does not need to determine whether there are disputed facts to resolve at trial since the administrative agency is the finder of fact. Instead, my task is to review the administrative record and determine whether, as a matter of law, the Service's action complied with the APA." *Id.* at *3 (quotation marks and citation omitted).

---

the Service; (3) Chad F. Wolf, then-acting Secretary of Homeland Security; (4) the Service itself; and (5) the Department of Homeland Security. (Am. Compl. ¶¶ 12–16.)

Tracy Renaud is now the acting Director of the Service, and Alejandro Mayorkas is now the Secretary of Homeland Security. USCIS, *Tracy Renaud, Acting Director, U.S. Citizenship and Immigration Services*, https://www.uscis.gov/about-us/organization/leadership (last visited April 27, 2021); DHS, *Alejandro Mayorkas*, https://www.dhs.gov/person/alejandro-mayorkas (last visited April 27, 2021). Pursuant to Fed. R. Civ. P. 25(d), when a public official is a party to an action and subsequently leaves office, that official's successor may be substituted as a party. Accordingly, Tracy Renaud is substituted for Kenneth Cuccinelli; and Alejandro Mayorkas is substituted for Chad Wolf. The accompanying order will direct the clerk of the court to amend the docket and caption accordingly.

## III. DISCUSSION

The APA empowers courts to review agency actions and set them aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary-and-capricious review requires me to assess whether the decision was "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). My review "is deferential, and a court may not substitute its own policy judgment for that of the agency." *Id.* (citations omitted). I review only the grounds invoked by the agency when it made its decision. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020).

Arbitrary-and-capricious review also encompasses deferential review of whether an agency's "factual judgment[s]" are supported by "substantial evidence." *Assoc. of Data Processing Serv. Orgs., Inc. v. Bd. of Govs. of the Fed. Res. Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) (Scalia, J.); *see also Soltane v. U.S. Dep't of Justice*, 381 F.3d 143, 151 (3d Cir. 2004) (Alito, J.) (reviewing factual findings in support of a visa denial for substantial evidence); *Fogo De Chao*, 769 F.3d at 1146–47 (same); *Brazil Quality*, 531 F.3d at 1067–68 (same). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Taransky v. Sec'y of U.S. Dep't of Health & Human Servs.*, 760 F.3d 307, 313 (3d Cir. 2014) (quotation marks and citation omitted).

Plaintiffs challenge the Service's conclusions regarding the "doing business" and "executive or managerial capacity" requirements for an L-1A visa. Plaintiffs identify several flaws in both. I agree, to some extent, and explain the aspects of each conclusion which I find are arbitrary and capricious.

### A. Doing Business

There are two flaws to the Service's finding that Sequretek was not doing business in the United States for the previous year.

First, the Service's focus on Sequretek's profitability was misplaced. Profitability is not cited as a factor in the statute or regulations. "An agency action may be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider . . . ." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (quotation marks and citation omitted). The Service noted that Sequretek's bank statements showed "mostly withdrawals/debits and very few deposit/credits." (A.R. at 3.) "Doing business," however, only means "the regular, systematic, and continuous provision of goods and/or services." 8 C.F.R. § 214.2(*l*)(1)(ii)(H). The plain language of the regulation does not impose any requirement that the firm turn a profit or show revenue.

I do not say, of course, that profitability and revenue are irrelevant to determining a business's viability. It is common knowledge, however, that a business in its early years may show high expenditures in comparison to little revenue. The Service provided no acknowledgment of that fact or explanation as to why it was not important. Rather, it seems to have relied on profitability as such, imposing it as a requirement or near-requirement.[3]

Second, the Service failed to acknowledge key evidence tending to show that Sequretek was "doing business." An agency has a general obligation to explain why it rejects evidence contrary to its conclusion. *Soltane*, 381 F.3d at 151. The Service itself has issued a binding opinion instructing adjudicators to "consider the totality of the record" when evaluating whether a firm meets the "doing business" requirement. *Matter of Leacheng Int'l*, 26 I. & N. Dec. 532, 535 (AAO 2015). Here, the Service rested its ruling on Sequretek's revenue and Mr. Naik's compensation. Other evidence in the record, however, tended to show

---

[3]  The Service is not entitled to deference to the extent it may argue that it interpreted the "doing business" regulatory definition to require a focus on profits or revenue. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2416 (2019) (agency interpretations of ambiguous regulations receive deference only if, among other things, they come from "vehicles[ ] understood to make authoritative policy"); *Fogo De Chao*, 769 F.3d at 1136–37 (interpretation of L visa regulations in denial of petition was not entitled to deference).

8

that Sequretek was "doing business." Specifically, Sequretek had leased an office space, hired at least five employees, contracted for business-support services (*i.e.,* accountants, human resources management), and made sales. (*E.g.,* A.R. at 166–76, 254–58, 405–07, 454–46.) The Service had an obligation to explain why this evidence was insufficient or why it was outweighed by evidence of Sequretek's revenue and Mr. Naik's compensation.

For these reasons, the Service's finding on the "doing business" requirement was inadequately explained.

### B. Executive or Managerial Capacity

I find three flaws in the Service's finding that Mr. Naik was not employed in an executive or managerial capacity.

First, the Service failed to acknowledge and explain key evidence regarding Mr. Naik's duties. The Service explained that Sequretek's description of Mr. Naik's duties was too general and "could apply to any executive." (A.R. at 6.) In support of that conclusion, the Service cited a list of fourteen duties provided by Sequretek. (*Id.* at 5–6.) These duties are indeed general; for example, they include "[m]anage the Company's costs" and "[p]rovide strategic consulting." (*Id.* at 6.) Courts have affirmed the Service's denial of L-1A visas when the petitioner only provided general descriptions of duties. *E.g., Brazil Quality*, 531 F.3d at 1070; *Saga Overseas, LLC v. Johnson*, 200 F. Supp. 3d 1341, 1348 (S.D. Fla. 2016).

This case, however, is distinguishable because Sequretek also provided a more specific list of Mr. Naik's tasks and accomplishments. (A.R. at 454–56.) This list included specific professional hires; contracts negotiated with a tax accountant, a staffing firm, and facilities; and partnerships developed with other technology companies. (*Id.*) All in all, Sequretek gave thirty-eight specific tasks and accomplishments, and provided corroborating evidence for them. (*Id.*)

9

The Service's decision never discusses or even mentions this thirty-eight-point list. Again, the Service might have had reasons to reject this evidence, but if so, it needed to explain them. *Soltane*, 381 F.3d at 151.

The Service's best explanation was that Sequretek's "statements" about Mr. Naik's duties included "several general duties that could apply to any executive" and "do not provide insight into the actual nature of the role." (A.R. at 6.) There are three problems with this explanation: First, it is too conclusory. *See Soltane*, 381 F.3d at 151 (the agency must provide some "reasonable detail why [] evidence was insufficient"). Second, it runs contrary to the evidence because it strains reason to say that a thirty-eight-point list is insufficiently specific and provides no insight into Mr. Naik's role. Third, it makes little sense because the Service does not explain why a job description that generally fits that of an executive somehow is ineffective in proving that Mr. Naik serves in an executive capacity, particularly in conjunction with the more specific thirty-eight-point list. That the applicant included general descriptions *in addition* does not detract from the specificity of the list. At bottom, Sequretek provided specific evidence, which the Service inaccurately said was lacking, and the Service did not "provide adequate reasons" why it rejected that evidence. *Soltane*, 381 F.3d at 151.

Second, the Service did not explain why it rejected the expert report provided by Sequretek. Instead, the Service explained that it was under no obligation to defer to an expert opinion. (A.R. at 6.) This may be true, but the Service must at least explain *why* it chose to reject an expert opinion. *Soltane*, 381 F.3d at 151; *cf. Brazil Quality*, 531 F.3d at 1070 n.9 (affirming agency's rejection of expert opinion because the agency explained that it was based only on general descriptions of the position). The Service may well have a solid basis to disregard the expert opinion here, but it must state that basis.

Finally, the Service's consideration of subordinates' duties was inadequate and in tension with the statute. The Service explained that the small number of subordinates and the lack of specific descriptions of their

10

duties meant that Sequretek failed to establish that the subordinates "relieve" Mr. Naik "from performing non-managerial duties." (A.R. at 6.) The INA, however, requires a more general and contextual assessment:

> If staffing levels are used as a factor in determining whether an individual is acting in a managerial or executive capacity, the [agency] shall take into account the reasonable needs of the organization . . . in light of the overall purpose and stage of development of the organization.

8 U.S.C. § 1101(a)(44)(C). The Service did not acknowledge that Sequretek was in its earliest stages of development, meaning that Mr. Naik's duties may skew towards the operational until he gets the office fully staffed and functional. Moreover, "executive capacity" and "managerial capacity" mean that the employee "*primarily*" perform duties fitting those descriptions. *Id.* § 1101(a)(44)(A), (B) (emphasis added). The Service's decision is most consistent with a view that Mr. Naik must *exclusively* perform executive or managerial tasks. That is not what the statute says, so I cannot affirm the Service's rationale. *See Sierra Club v. U.S. Env't Prot. Agency*, 972 F.3d 290, 298 (3d Cir. 2020) (courts may reject administrative decisions that are "inconsistent with a statutory mandate" (citation omitted)).

For these reasons, the Service's finding on the nature of Mr. Naik's role was inadequately explained.

\* \* \*

Because both rationales for the Service's denial were arbitrary and capricious, I cannot affirm its decision. *See Fogo De Chao*, 769 F.3d at 1149 ("Where, as here, an agency has set out multiple independent grounds for a decision, we will affirm the agency so long as any one of the grounds is valid . . . ." (quotation marks and citation omitted)). The APA empowers courts to "set aside" unlawful agency action, 5 U.S.C. § 706(2), so the ordinary course is to "vacat[e] invalid agency action and remand[ ] the matter to the agency for further review." *Comite De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 191 (3d Cir. 2014). Remand is particularly appropriate here, because

11

the essential problem was a failure to consider evidence or adequately explain rationales. *See Soltane*, 381 F.3d at 152. The Service is entitled to a second opportunity to fully consider and discuss the evidence.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion for summary judgment is granted. The Service's motion for summary judgment is denied. This matter will be remanded to the Service for further review consistent with this Opinion.

A separate order will issue.

Dated: April 28, 2021

/s/ Kevin McNulty

_____
**Hon. Kevin McNulty
United States District Judge**